3-23-06-66 Veronica Montoya Appley v. Board of Trustees of the Illinois Municipal Retirement Fund et al. Appellants. Thank you. Good afternoon. Good afternoon. Um, let's see, Ms. Anna Chemolsky. Yes. Um, okay. And Ms. Grossman. Yes. Ms. Grossman, are you ready to start? I am ready. You may proceed. Thank you. Good afternoon again, and may it please the court. The case, this case presents a single issue, whether the record contains evidence to support the decision of the IMRF Board of Trustees in denying Ms. Montoya's application for total and permanent disability benefits. We argue that the record contains ample evidence to support the Board's determination that plaintiff can engage in gainful activity and therefore did not meet the criteria of being totally and permanently disabled per statute, and that decision should be upheld. Now, the facts in this case, as presented, are that the plaintiff applied for total and permanent disability benefits after the exhaustion of her temporary benefits that were previously awarded. Due to this termination of temporary benefits, plaintiff made that application, and IMRF initially requested that the plaintiff undergo a functional capacity evaluation or examination, also known as an FCE. This plaintiff was initially able to receive authorization from her personal physician, Dr. Gray. However, that was later rescinded by another personal physician being Dr. Tweet. Based off of that, IMRF arranged for an independent medical evaluation or an IME, instead with a board-certified cardiologist being Dr. Dan Fintel. Based on this IME, two medical reviews from Dr. El Safwa, another board-certified cardiologist, and a plethora of medical records, the IMRF Board ultimately denied this application as they found that she could engage in gainful activity. She then appealed, and the Circuit Court of DuPage County then reversed that decision from the Board. At the outset, it's important to note that gainful activity, as stated in the statute, being 150, is left undefined. However, in its rulemaking authority, the IMRF Board of Trustees did define gainful activity in Board Resolution 2016-02-08, stating that the claimant is capable of obtaining potential employment in any occupation or position where that applicant has the ability to earn the minimum Social Security earnings limitation. This finding by the Board should have only been overturned if no rational trier of fact could have agreed with the decision of the Board, and that is in the light most favorable to the agency. This is seen in Hadler and also in Chief Judge of Cook County v. American Federation. Further, looking to Abrahamson, quote, if the record contains evidence to support the agency's decision, it should be affirmed. Here throughout the record, there are multiple areas contained that support this Board's decision. And to take them individually, to start with, Dr. Dan Fintel, as mentioned before, was brought on to perform this IME on Ms. Montoya. Now, Dr. Dan Fintel is board-certified in cardiology and is also a professor of medicine at Northwestern University. In a report that was dated June 22nd of 2022, he noted what he considered in making his final determination. This includes medical records from her personal physicians, a physical examination that he performed on Ms. Montoya, as well as using his background and knowledge in this specialty. He found that her condition was brought on by physical exertion and that ultimately she could engage in work and gainful activity so long as that activity was sedentary. He stated that from a cardiac perspective, she is not totally and permanently disabled, given that she would be able to engage in gainful activity as long as it does not involve physical exertion. Second, there is Dr. Alsafwa. Dr. Alsafwa similarly is board-certified in cardiovascular disease and interventional cardiology. He's also fellowship-trained in heart failure. He initially performed a medical review, a document review, and in a report dated November 7th, 2019, he ultimately determined that she is able to perform gainful activity and is not totally and permanently disabled. Similarly to Dr. Fintel, he did note that she was able to perform this work so long as it was sedentary. And in this review, he noted areas in which in her own personal positions, including Dr. Gray, indicated that she was able to lift or carry up to 10 pounds. She could perform fine manipulation and grasping. She could stand for two hours. She could drive for one hour. And also noted that she could walk 10 to 15 minutes per hour as needed. In the second review, dated April 6th of 2022, IMRF... A quick question. That fact that was in that report, that she could walk 15 minutes an hour. Do you believe that is supported or consistent with all the other statements and medical records in this record? I do in the sense that he made this determination based off of medical records from Dr. Gray where he performed a physical capacities evaluation. Dr. Tweet, who stated in the letter that ultimately denied IMRF from moving forward with the FCE, that these conditions, namely the SCAD, S-C-A-D, is associated with exertion. So I do believe that is supported throughout the record. And he makes note of this in the second report with the addition of that letter from Dr. Tweet. And he ultimately does not change his final medical opinion, including the fact that she isn't able to obtain an FCE. He stated that she should not have any work that requires exertion, but sedentary work would be appropriate because her symptoms are largely based off of exertion, which is supported by the very letter that Dr. Tweet sent into IMRF denying the ability to move forward with an FCE. Now, Dr. Alsafwa in that report, in that second report, also stated, made some statements indicating that if an FCE is required by law, that she would be totally and permanently disabled. As I'll discuss later in my argument, IMRF is of the, or the appellant is of the opinion that an FCE is not required by law. And Dr. Why did you say it in those letters that were sent out? So that, those letters were sent out by an employee of IMRF, and that was wrong. It was an incorrect statement of the law. What did the letter say? The letter stated that the FCE is required by law. So it was a complete misstatement. It was a misstatement. A complete misstatement. A complete misstatement.  Yes. So, you're, the appellant here is of the opinion that the FCE is a convenience for, for, not creation, but finding evidence as to whether or not there's total disability. Is that right? I believe it's an assertion of the disability. If there is a disability, and if a, a claimant is able to meet that gainful activity definition, if they are able to perform work, and here an FCE wasn't authorized by one of the physicians. So, IMRF took it upon itself to employ an IME where she could get that medical evaluation without such aerobic exercises that may tend to show that, not show, but tend to exacerbate her condition. So, what is the purpose of an FCE? An FCE is to ascertain what, where that individual is currently with their disability. It's to be evaluated by. It's a tool, is it not a tool to determine whether or not gainful employment can be had by the applicant? Yes. Okay, okay. Yes. And so, and who conducts an FCE? An FCE is conducted by a third party organization.  Yes, yes. But what are the qualifications of the person who's conducting an FCE? It's, it's done by an outside entity. I don't believe it has to be a medical doctor. No. It doesn't have to be a specialist in any way. Technically, it does not have to, have to occur. Do they render an opinion as to the availability of gainful employment based upon the determination of what the person's functional capacity is? Yes. And so, you don't have that, do you? Not in this case, no. Okay, so that determination is being met by a medical doctor, is that correct? That's correct. And what qualifications does a medical doctor have as to whether there is any available employment for someone with that level of medical condition? Sure. So, in this case, Dr. Dan Fintel, who specializes in cardiology, which are the, which is part of the claim in this case, is that she was experiencing adverse cardiac events. So, he is able to assess her medical condition and see if she is able to perform such tasks as I stated before, if she's able to perform work at all. Then the, then IMRF employs a vocational assessment to see whether or not she can engage in any other professions or work, and if those jobs exist. So, what would the vocational person say? Yes, thank you. That was my next point, is that we did employ a voc in this case, and they did first indicate that and determine that she is suitable for a variety of positions. They listed customer representative, order clerk, a variety of positions. Then they took a look at the national economy and said, do these jobs exist? Or is this some nebulous determination that she can perform general work? And they found that these jobs do exist in reasonable numbers in the national economy. And further, they found that to reduce further workplace stressors, that these jobs can be found in remote situations or in an at-home work-based situation. So, there are actual jobs available in real time in the market as of August 2022 that Ms. Montoya could avail herself to. At the level of medical condition determined by two doctors that you had? Yes, one of them physically examined Ms. Montoya, being Dr. Dan Fentel and Dr. El Safwa doing the medical document review. And as noted in the VOC, they did take into account those findings as well as her medical records of what she's capable of performing. Did they take into account conditions other than her cardiology condition? So, IMRF is confined to her conditions that existed prior to the individual terminating from IMRF. So, they did take a look at all relevant medical conditions that she was experiencing and made that determination based off of that. So, when the VOC made his recommendations or her recommendations, that included not only the cardiology, but also the idiopathic epilepsy and the other conditions that she had? So, the idiopathic epilepsy was outside of the timeline that we consider for this case. That would be defined by statute in 750A6. The only conditions that we can consider, again, is prior to the claimant terminating from IMRF, from their position. And I believe those largely subsided prior to this claim. And can you tell me what a transportation coordinator does? What's the nature of that work? So, the transportation coordinator, I believe, is in the record with a job description. It's an individual who, as it sounds like, works for a school district and determines bus routes and works with transporting children in and out of the school district. Is that a sedentary position? I believe it was noted that it was a sedentary position in the record. I'm not aware of any physical requirement. I think in the actual job description, there is a physical abilities section that states that she has to be able to carry so many pounds. But I'm not sure if, in reality, that's exactly what happens. With that, so then you concede that she couldn't perform her present job? And I guess that would be, it's not that she, the standard would be that she would be able to gain potential employment in any occupation. So, it's not really a necessary question of if she could perform her present job. It would be if she could perform work in any position. And the VOC found that she could. But if her present job was sedentary and you found that she was disabled from that job, is that relevant? I don't believe there's a determination that that job was, in fact, sedentary. I think it's mentioned in the record that it may be sedentary. But there is a caption in that job description that I believe indicates that there are some physical requirements to the job. Thank you. Are there any other questions for Ms. Grossman at this time? I know we're over, but I have one quick one. So, they've determined that she's not disabled because she's able to achieve gainful employment. How many hours a week does that determination contemplate she would work? So, the, I guess it doesn't necessarily matter how many hours a week she works. It just matters if she would be able to have that gainful earnings limitation provided by Social Security. That is the minimum requirement according to the board resolution. Anything further? Okay. I do not. Thank you, Ms. Grossman. Thank you. Ms. Onachemowski? Yes. May it please the court. Obviously, I'm representing Ms. Montoya, the appellee. And the issue in this case, Your Honors, is whether or not Ms. Montoya is totally and permanently disabled under the Illinois Pension Code 7150. And even the IMRF agrees that that is, quote, the main issue. It is not whether or not the record has evidence that supports their position. Ms. Montoya, as Your Honors seem to already know, is a severe cardiac patient. And on her last day of work, she had a heart attack. She's had four heart attacks. And her, I'm not going to go into all the details about everything, but she has inflammation of the heart, seizure disorders, coronary artery dissections, chest pain, a condition that has progressive twisting of blood vessels that all revolve around a cardiac issue. And the unanimous medical opinion of all the doctors, and that includes the IMRF doctors, is that she's totally and permanently disabled. And one of the reasons in the record and in the evidence is because that she could not be medically cleared to even do an FCE, even one that is tailored to cardiac patients, even one that is only to find out whether you can do sedentary work or not. It is the IMRF that repeatedly said that the FCE is a requirement by law. Letters were sent to counsel, were sent to every doctor, and were sent to Ms. Montoya herself. When the IMRF now says that an employee is the one who made the requirement, these letters went out repeatedly. And so if there was an issue right there that that was not, shouldn't have been sent out that way by an employee, then they should have said something, you know, maybe four years ago. And so they have ratified the fact that the IMRF requires an FCE by law, and they have the authority to do so in their rulemaking authority. But even prior to the FCE being required, from the beginning of this case, all of Ms. Montoya's doctors, which is Dr. Gray, Dr. Tweet, and Dr. Devonshire, who has since retired, said that she was disabled. What the doctors that the IMRF refers to are Dr. Al-Safwa, I hope I'm saying his name right, Dr. Al-Safwa, Dr. Fintel, and the vocational expert is a Robert Wegman, who is not a doctor. They're all the ones that are saying that she is not disabled. So what Ms. Montoya is asking this court to do is to determine what is just and reasonable by looking at all the evidence, and all the evidence includes the fact that Ms. Montoya could not be medically cleared to do an FCE. The IMRF has not offered any reason why the opinions of her treating doctors, Dr. Tweet is a cardiologist at the Mayo Clinic, Dr. Gray has been treating her for I don't even know how many years, and also the same thing with Dr. Devonshire, but as I said, he has retired, and he kind of retired just as I came into this case. So my understanding from the records is that he was, you know, very similar to Dr. Gray. And this is not a case of whether, you know, there's a mere existence of conflicting opinions, the IMRF has to have a reasonable basis to select one set of medical opinions over another set. What the IMRF did here is that they relied on their own doctor's initial opinions, and not their final opinion or the involving opinion when considering all the evidence, which includes the fact that she could not do, she couldn't be medically cleared for doing it. How do you define a reasonable basis here? A reasonable basis would be to look at all the evidence. What the IMRF is saying is that their doctor said that she can do sedentary work, and then the requirement came out with the FCE that she had to, you know, do an FCE required by law in, you know, 10 letters, not just one letter. And so when they could not do the FCE, she could not be medically cleared, they simply ignored it. So what they needed to do is look at all the evidence. What do you mean they simply ignored it? I mean, she did not have to take the FCE, it was a misstatement, was it not? I'm sorry, can you repeat that? Yeah, she didn't take the FCE, she was not required in this case to take it, am I correct? She was required by law by the IMRF, but she couldn't do it. She couldn't do it because of medical, she wouldn't be cleared for medical clearance. So I thought I understood from opposing counsel it was a misstatement that she was required to take an FCE. Well, Your Honor, it was a misstatement that was in at least four letters that I can remember. Two to me, one to Mr. So what if it was a misstatement 100 times? It still was a misstatement, is that correct or not? No, I don't think that is correct, Your Honor. I think that in every case, and this is, you know, the FCE can decide what they want to require from each person who comes as a claimant. Not the FCE, not the FCE, the IMRF. The IMRF can, in each individual case, what I'm trying to say, Your Honor, is that in each individual case, when a claimant comes before the IMRF, they look at the conditions and decide whether or not, you know, whether this person is disabled or not, and they can decide what tests or what doctor they want to send them to depending on the condition. And so in this case, they required both an FCE, which she could not do, so that's evidence that she could even go through testing to even find out if she can do sedentary work, and an IME. The IMRF is, you know, seems to repeatedly say now that the only reason they did an IME was because there was no ability to do an FCE, which is not the case. An IME is completely different from what an FCE is. An FCE is, it's licensed occupational therapist, a physical therapist, that over, as I understand it, I'm not a physical therapist or a doctor, but that over a two-day period, several hours, that she's, you know, doing a lot of aerobic or type of lifting things, where an IME is, is that a doctor's looking at the medical records. Correct, but a functional capacity is to determine the capacity of the person to perform gainful activity, work that would be gainful activity, am I correct? Yes. Okay, so she didn't take that. But my question is, an FCE isn't sedentary work in any way, shape, or form. But a sedentary, an FCE, one of the reasons to do an FCE is to see if she can do any work at all, including sedentary work, and she couldn't even do that. She couldn't do an FCE, which is, when you do that, that's not a sedentary activity, to do an FCE. No, no, that itself is not. However, they're going to tailor it to, like, say, for example, to her as a cardiac patient. And a cardiac, you know, Dr. Tweet, her Mayo Clinic cardiologist, was very concerned that if she had to do anything at all, any kind of physical exertion or whatever that was required, that she, in one of the letters, that she, if she was going to do it, that she would need, like, an emergency help. Okay, let's assume a fact, let's assume that that's true, his opinion, the doctor's opinion. Right. So now the real question for IMRF is, is whether or not she can engage in gainful employment. If she can't, then she's permanently disabled. Isn't that the final issue? Well, that is a final issue, yes. Okay, okay. So, the FCE was not required, based on a doctor's opinion, of physical exertion. So the question is, is there gainful employment without physical exertion anywhere in the economy? And what was the evidence? Your position is, no, there must not be, there isn't. Well, Ms. Montoya's doctors did not say that she, always said that she was totally disabled from the beginning of this case, even before the FCE requirement. So, she could not, I mean, even... Was there any evidence in this case that she could be gainfully employed in sedentary activity? I'm sorry, I can repeat that again. Yeah. Let's assume she cannot do anything except sedentary activity. I think that's what they said, right? I don't think she can even do sedentary work. Okay, so that's one argument you have. But the question is, I thought I heard from the opposing counsel that they had some expert or someone saying that sedentary activities can still be gainful employment. That was, that, I don't know which one she, that she was referring to, but the vocational expert who is not a doctor is being told that, you know, this person, that the two other doctors have decided that she can engage in sedentary work. So, see if there's work that she can do. So, it's my opinion that these vocational assessments automatically already assume that the person can do the job. They already can assume that they can do a sedentary work. So, of course, they're going to find jobs in the national economy. Well, we know that process, but now let's get to the point. There is evidence in this record by cardiac doctors, cardiologists, that she can engage in sedentary activity. Just right there, is there not? Prior to the inability to do an FCE. Well, let's forget the FCE, that's just a tool. And then they have some evidence, don't they, that sedentary, there are jobs for people who can only perform sedentary activity. And that came from a voc expert, I believe? I think so, Your Honor. Okay, so if you accept it, well, I thought I heard that. So, if that's the case, what is wrong with the IMRF's decision? That she's not permanently disabled from gainful employment in today's economy? Because Ms. Montoya's doctors found her to be disabled, and they're just looking at their own doctor's opinions. And they're deciding, you know, without looking at all the evidence, that she can engage in sedentary work, and therefore she's not totally and permanently disabled. So what evidence didn't, so can't they, is there any evidence to support their conclusion at all? That conclusion that she can engage in sedentary work? Yes. Is that what you mean? Yeah, I mean, don't they have some evidence that supports their decision? Initially, but not after, if you consider all the evidence. And if you look at everything put together, the entire record, that it's just not reasonable. What's the standard of review? The standard of review, well, appears to be the manifest weight of the evidence. But I also believe it's also a clearly erroneous standard, that a mistake has been made. Well, let's assume it's manifest weight of the evidence. So how do you define manifest weight of the evidence, if it's assumed to be that? That if it's against the manifest weight of the evidence, it would be clear by looking at the entire record, that the opposite conclusion that was reached is the correct one, as opposed to the one that was reached. That's how I understand the manifest weight of the evidence. But Your Honor, are you finished, Your Honor? Yes, I am. Please go on. Okay. I just want to continue by saying that, number one, it's not a mistake that the IMRF required it by law. They required it by law in this case with Ms. Montoya. And what happened is that they wanted to get an FCE to get more support for their position, and instead the opposite happened. So they just decided, like, okay, whatever. I'm curious about your phraseology, more support for their position. Is the IMRF prejudiced at the outset, or are they a neutral determiner? No, what I'm saying, Your Honor, is that Ms. Montoya's doctor, she had three doctors that all said she was totally disabled, even before this FCE. Now they have two doctors and the vocational expert who all said that she can do sedentary work. So what they were doing, it appears to me, is that they were trying to get even more evidence to support their position. They wanted to counter the three doctors that Ms. Montoya had. So you're saying the IMRF, this board, whatever, are really advocates or prosecutors? No. I mean, I'm just trying to figure out, you know, what their orientation is in this determination. I think they do everything they can not to pay legitimate claims. That's exactly what I think. You know, I mean, it's, I mean, with all her conditions and everything you look at, and her own doctor saying that she's, you know, disabled. I have a question. I'm sorry, Your Honor. Counsel, I have a question about something you just mentioned when you say all her conditions. I know in the medical records that are reviewed, that are all in the record we have, there are a couple different references to her diagnosis of depression and anxiety that she's prescribed Xanax for the anxiety. And I know in the Social Security decision, it is noted that, and obviously considered by them, when they list all her severe impairments, they start off with the heart issues, my myocardial infarction, and they go on and on. And then depression, they list depression. I guess what I'm saying is there's several references to her depression and anxiety disorder. And did that, was that ever discussed? Was anybody that, it's like no one's mentioned in any of the briefs. I don't see it anywhere like it was ever considered. Or is it just not, it was never capitalized upon or looked at closely by anyone? Not just the physical, but the, because clearly, I think it's clear she had these before the heart attack. Was that considered at all? I guess maybe it might be a question for Ms. Grossman whether her clients actually considered any of that. It just seems like it was completely ignored. I don't think, I don't think, I don't remember it in the record from the IMRF. But I, you know, since you mentioned Social Security, she is, she continues to be on Social Security. And I know that, you know, just because she's on Social Security doesn't mean she has to be, receive IMRF benefits, but it is evidence that she's on Social Security and she is today. For physical reasons, not just with the depression. I mean, I really don't recall much of the, of the depression or anxiety, but I do know in looking at all her medical, I mean, prescriptions that she's taken that Xanax was one of them. And, I mean, I think the depression was probably brought on because of all her conditions. So I really, I really don't have, have an answer about why it wasn't mentioned in the, in the IMRF records. I don't remember it in the, in the IMRF documents. It's documented, it's referenced in a couple of different places. And then both of those diagnoses are mentioned in the Social Security decision. So I'm just wondering, it just seemed like it wasn't, it clearly Social Security considered it to some level, but there's no reference to it at the same level in the, in this case. I just was curious whether it was just not an issue discussed, I guess at the hearing. I don't recall it, Your Honor. What, what do you, when you say hearing, you mean at the board hearing? Yes, that's what's before us. And it just sounds like the answer is no, it just wasn't, wasn't raised, wasn't dealt with. But that's why I just, I was curious because I see it in there at least three or four different places. Okay, no, it wasn't really mentioned, Your Honor. It was, I mean, everything was focusing on the heart attacks and, and the whole issue about she couldn't be medically cleared to do the FCE. So, let's see. I don't have any more questions. Okay, thank you, Your Honor. Your, your time is up. Thank you. Okay, thank you. Thank you, Your Honor. Ms. Grossman, rebuttal. Yes, thank you. Before you start, I have a question that I think I just forgot. I'll come back to it. Since you've already interrupted her, Mary, I'm going to jump on your interruption and continue. I do have a quick question. The report from Gen X employee assessment, it's the only place I see a definition for sedentary work. Does your client stand by the definition of that, which is sedentary work is defined as exerting up to 10 pounds of force occasionally and or a negligible amount of force frequently to lift, carry, push, or pull, or otherwise move objects. Sedentary work requires sitting predominantly, but may involve walking, standing, and standing for a brief period of time. That's the definition. Is that a question to me, Your Honor? No, no, no. That was for Ms. Grossman. Oh, I see. Okay. It was in their report. Do you stand by that definition, I guess? Does your client stand by that? At this point, I believe we would stand by that. I think that is somewhat of a definition of sedentary work. It's not in statute of what is defined as sedentary work, so I think that's why there is this discussion. You adopted that report, did you not? Yes. Okay. So let's cut to the chase here real quickly. You adopted the report. Yes. So what evidence, if any, goes to that definition? Of course, the board's finding that she is able, in her level of condition now, to be gainfully employed in the workplace. So in the record under Dr. Alsopha's review, I believe the report starts on page 518. He does indicate that she could stand for two hours. She can drive for an hour. She can occasionally lift and carry up to 10 pounds. She can perform fine manipulation and simple grasping. It's also noted in that report that she can walk up to 10 to 15 minutes per hour. And this is based on … And maybe I should let you finish that sentence because that's page 18. This goes back to my question. Do you think that's inconsistent with the statement on the very page before, right before the conclusions, by Dale Gray, the doctor, Physical Capacity Evaluation, the claimant was unable to walk. The claimant can occasionally lift up to 10 pounds. The claimant could not bend, squat, crawl, or reach above her shoulder level. The claimant could perform simple grasping and fine manipulation. The claimant was unable to push or pull. And it's one page away from this statement that you're citing. Those seem diametrically opposed to me. I understand. And that is one opinion from Dr. Gray, which is Ms. Montoya's personal physician. But Dr. El Safwa did a comprehensive medical review of the entirety of the record. So I believe based off of the entirety of the record, that is what he's basing his opinion on. And that's further solidified by the later report by Dr. Fintel, which largely comes to the same conclusions, that she can perform the sedentary work, ultimately. So I would stand behind that. And the existence of medical, we're not shying away that there is an existence of conflicting medical opinions. That's hard. That would be hard for me to run away from. But according to case law, according to Dante specifically, the mere existence of those conflicting medical opinions isn't sufficient to overturn the board's decision. And I would argue that the reliability of two board certified cardiologists does tend to show reliability in their assessments of this medical review. And I would just like to go back. Are you talking about a standard of review here just previously? Yes, Your Honor. And what do you think it is? And if so, why do you, I mean, what do you think it is? I believe it is the manifest weight of the evidence. And how do you define that? That manifest weight is discussed in similar cases such as Hadler, which would be that the board should only be overturned if no rational trier of fact could have agreed to the decision of the court. Is there evidence contained in the record that supports the board's decision? Well, you know, that's really interesting when they define that because it's all over the board for years with the Supreme Court's definition. Yeah, rational trier of fact. And then you have a second clause there, right? And what's that second clause? And I'm sorry, I missed that, Judge. That standard review, read it very carefully what you say it is. Yes, Judge. It is that no rational trier of fact could have agreed with the board that there is evidence contained. Okay, rational trier of fact, that's a clause, could have agreed with the board. Yes. Okay. And then you start talking about quantum of evidence, don't you? Yes. And what's that language? That whether the record contains evidence to support the board's decision. Okay. And so some people interpret it in other cases. Is there anything in this record that will support the board's decision? Yes. Yes. So where does this rational trier of fact and all this stuff come from? That comes from the case of Hadler. That is directly from the case of Hadler. And Abrahamson. Sorry, excuse me. If the record contains evidence. And that is to be seen in the light most favorable to the agency, according to Chief Judge of Cook County versus American Federation. So that is based in case law and some case law being Hadler, similar to this. So, but your argument is, is there's evidence in the record to support the board's decision. They have deference. Okay. Is that what you're saying? Yes. Okay. I would be. Ms. Grossman, I do have one question. And just for clarification, the board is not taking the position, is it, that she refused to have an FCE? No, we are not of the position. That would be an eligibility issue, according to the statute, whether the board could technically deny somebody if they were to refuse an FCE. Here, she was able to obtain clearance from Dr. Gray, which was later rescinded by Dr. Tweet. So, we proceeded with an IME. An acquiescence from Dr. S. Yeah, your Dr. S. Wada. Yes. Okay. Yes. Okay. Thank you. Thank you. Are there any other questions for Ms. Grossman? Oh, I do have a question. What about this Social Security thing? Yes. What is the weight and relevance, if any, that a person is on Social Security disability? So, that is obviously able to be used as evidence, as it was in this case, as it's contained in the record, just as any other type of evidence. Here, there are expert opinions that were used by the board that went against that ultimate conclusion. So, here, there is a reliability on not just on what everything that was considered. Although they came to an ultimate different conclusion, they also have different standards as defined by various statutes. We are confined to 7150. And 7150 states that we can only consider certain conditions. Social Security can consider any physical condition, any mental condition, and pretty much all medical conditions, Social Security can consider. IMRF does not have that same ability. So, back to Justice Peterson's question. He was talking about depression, anxiety. Are you prohibited from considering that? Not that I'm not aware of that, Your Honor. I know that the bulk of what this claim was considered and what we were confined to were her cardiac conditions. Why were you confined to that? Her statute. What existed prior to the claimant terminating from her IMRF position. That is what we were considering. You say confined and everything else. But I think Justice Peterson alleged that she had these conditions which awarded her Social Security disability. And those were prior to her leaving her employment. Am I correct? I mean, where do you draw the line? How far back do you go? What is excluded or included? It would be largely based off of her medical history, what the evaluators have seen, what her initial claim is for. And this is also going off of what she received her temporary benefits for. Ms. Montoya, just to remind the Court, was approved for temporary disability benefits. IMRF approves thousands of disability claims each year. When there is the move to total and permanent disability benefits, there's a different standard. So there has to be some sort of review, especially from an independent medical opinion, whether or not she does meet that gainful activity limitation. And in her previous job, I think I misspoke that part of the job condition was to lift weights. And I'm sorry, that was an incorrect statement. A lot of those working conditions were she has to be able to drive a school bus. She has to sit for an extended period of time. She has to have repetitive hand motions. She has to have a Class B CDL. So a lot of these things were considered in totality with her claim, with her application, and with what we believed her total and potentially permanent disability would be. And in this case, we found that she isn't totally and permanently disabled based off of those cardiologists, as well as the vocational assessment and her own medical history. Just briefly, because I know we're done and I just can't help myself. The vocational assessment also in their list of jobs she could do is a complaint clerk, apparently fielding complaints for companies. Seems like a strange suggestion for this particular woman with all her ailments. And it's in the record that she's been diagnosed with depression and anxiety disorder and is prescribed Xanax. I couldn't help but chuckle when I saw complaint clerk. For what that's worth. Your Honor, there were a lot of various positions. That was one that they noted as could be an available option for her, whether or not she believes that she could perform that job is up to her. But what was contained in the VOC was that she could perform that job as it is sedentary. So you're saying that it still is sedentary? Oh, I'm sorry. With her prior job and your and your clarification that you made a minute ago. Are you still saying that that prior job, the job that she was terminated from was a sedentary job? In the job requirements, it states that things that would tend to show that I understand where your honor is coming from, or it could be a sedentary job that she has to sit for extended periods of time. However, when you look deeper into the job description, it does state that she has to be able to drive a school bus. That involves climbing upstairs, handling heavy machinery. She has to have a class BCDL. This is in the record at page 682. The title of her job she had was what? A transportation coordinator. That makes absolutely no sense with that description. I believe because it has to do with busing. And it says in there that she she may have to fill in with other department staff. So it may be a situation and I don't work for the school district. This is just a hypothetical coordinator. Kind of imply you sit at the desk and you chart out the number of buses based on student population and the routes and the times that you have to pick up students. Yes, I believe that's largely the job. But part of the requirements is that she has to have this these conditions met in order to perform that job. If there is, it says that she has to fill in with other department in for other department staff. In that case, it could with the bus driver. It could be a bus driver with the fact that she needs a class BCDL. So it's although it looks like a largely sedentary position, I believe there are duties that are involved that would not be in a the same as a remote job or work from home job or a customer complaint clerk. So are you aware of whether she ever did any of those other functions? I'm unaware of that. So to conclude, logically, this voc person saying there's positions out there would never recommend or suggest she could do the job she left. Well, and I think that's evident by them not recommending that position. They recommend they named multiple positions, and I don't believe transportation coordinator was one of them. But under the job description of this, the way they define transportation, her former employer described. Yes. Okay. Okay. Are there any further questions. Okay, we thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.